[No. 34085-2-II. Division Two. May 15, 2007.]

*In the Matter of the Personal Restraint of* JUSTIN M. HEGNEY, *Petitioner.*

512

514

*Justin M. Hegney,* pro se.

*Neil M. Fox* (of *Cohen and Iaria*), for petitioner.

*Gerald A. Horne, Prosecuting Attorney,* and *Kathleen Proctor* and *Michelle Hyer, Deputies,* and *Robert M. Mc-Kenna, Attorney General,* and *Donna H. Mullen, Assistant,* for respondent.

¶1 BRIDGEWATER, J. — In this timely personal restraint petition, Justin M. Hegney seeks relief from personal restraint imposed following his 2002 conviction of first degree felony murder, in which robbery was the predicate offense.

¶2 At the time of his offense, Hegney was 15 years old. After arresting him, the State asked the juvenile court to decline jurisdiction over Hegney, even though he was not yet 18 years old. The juvenile court so ordered. And the State charged Hegney in adult court, alleging, among other things, that he had committed first degree felony murder. Thereafter, a jury found Hegney guilty of first degree felony murder. After sentencing, Hegney filed an appeal. In an unpublished opinion, we affirmed his conviction.[1] We now deny his petition.

## ANALYSIS

### I. Personal Restraint Petition Standards

■■ ¶3 A personal restraint petitioner has the burden of proving constitutional error that results in actual prejudice or nonconstitutional error that results in a miscarriage of justice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). Regardless of whether the petitioner bases his challenge on constitutional or nonconstitutional error, he must state facts on which the claim of unlawful restraint is based and state the evidence available to support the factual allegations; he cannot rely solely on conclusory allegations. RAP 16.7(a)(2)(i); *In re Pers. Restraint of Williams*, 111 Wn.2d 353, 365, 759 P.2d 436

---

[1] We do not include the remaining facts here because we have already included them in detail in Hegney's direct appeal. *See State v. Hegney*, noted at 121 Wn. App. 1012, 2004 Wash. App. LEXIS 682, at *1-6 (2004).

(1988); *see also Cook*, 114 Wn.2d at 813-14. If a petition is based on matters outside the appellate record, a petitioner must show that he has "competent, admissible evidence" to support his arguments. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086, *cert. denied*, 506 U.S. 958 (1992).

## II. To-Convict Instruction

¶4 Hegney claims that the to-convict instruction "essentially set up a *res ipsa loquitur* theory," holding both him and his codefendant Jesse Hill[2] responsible for first degree felony murder. Br. of Pet'r at 16. He argues that the to-convict instruction caused "a series of constitutional violations." Br. of Pet'r at 16. We disagree.

¶5 At issue here is the following to-convict instruction that the trial court gave to the jury:

> To convict *either the defendant JUSTIN HEGNEY or the defendant JESSE HILL* of the crime of Murder in the First Degree as charged in Count I, each of the following elements of the crime must be proved beyond a reasonable doubt;
>
> (1) That on or about the 19th day of August, 2000, ERIK TOEWS suffered injuries that resulted in his death on or about the 25th day of August, 2000;
>
> (2) That *the defendant or an accomplice* was committing or attempting to commit the crime of Robbery in the First Degree;
>
> (3) That *the defendant or an accomplice* caused the death of ERIK TOEWS in the course of or in the furtherance of such crime or in immediate flight from such crime;
>
> (4) That ERIK TOEWS was not a participant in the crime; and
>
> (5) That the acts occurred in the State of Washington.
>
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
>
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

Ex. 11, Instruction 5 (emphasis added).

---

[2] The State tried Hegney in a joint trial with Jesse Hill.

¶6 Hegney contends that this instruction: (1) lessened the State's burden of proof because the first paragraph of the instruction referred to him and his codefendant in the disjunctive, thereby allowing the jury to convict him based solely on his codefendant's or his codefendant's accomplice's actions; (2) denied him his right to a unanimous verdict because it did not require the jury to be unanimous as to whether he was a principal or an accomplice or as to "which of several defendants or accomplices committed the charged acts"; and (3) permitted the jury to convict him of an uncharged crime because the State did not name his codefendant in the charging information. Br. of Pet'r at 21. In addition, he argues that his trial counsel was ineffective for failing to object to the to-convict instruction.

¶7 We review claimed instructional errors de novo, evaluating the instruction "in the context of the instructions as a whole." *State v. Benn*, 120 Wn.2d 631, 654-55, 845 P.2d 289, *cert. denied*, 510 U.S. 944 (1993). The instructions as a whole must provide an accurate statement of the law and allow each party to argue its theory of the case to the extent that it is supported by the evidence. *Benn*, 120 Wn.2d at 654.

¶8 Even assuming Hegney's claims were properly preserved and not invited error, we hold that these contentions have no merit when the jury instructions are read as a whole.

## A. Lessened Burden of Proof

¶9 Hegney claims that "there is no assurance that the jurors separately determined that Mr. Hegney personally committed the charged acts or had the requisite mental state." Br. of Pet'r at 19. But in addition to the to-convict instruction, the trial court instructed the jury:

> A separate crime is charged against one or more of the defendants in each count. The charges have been joined for trial. You must decide the case of each defendant or each crime

charged against that defendant separately. Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant.

Ex. 11, Instruction 3. By specifically instructing the jury that it must evaluate the charges against each defendant separately, this instruction cured any potential defect in the to-convict instruction caused by referring to Hegney and his codefendant in the disjunctive.

¶10 Absent any contrary showing, we presume that a jury follows the trial court's instructions. *State v. Davenport*, 100 Wn.2d 757, 763-64, 675 P.2d 1213 (1984). In this case, Hegney has not presented anything to overcome this presumption. Accordingly, his argument fails.

## B. Uncharged Crime

¶11 Relying on *State v. Brown*, 45 Wn. App. 571, 726 P.2d 60 (1986), Hegney claims that the to-convict instruction allowed him to be convicted of an uncharged crime, in violation of the United States Constitution and the Washington State Constitution. But even assuming, for the sake of argument, that *Brown* is not limited to conspiracy cases and applies in the accomplice liability context, his argument has no merit.

¶12 At issue here is the information, which listed two codefendants, Robert Anthony Hernandez and Terrance Lashawn Hunt, and which stated:

I, GERALD A. HORNE, Prosecuting Attorney for Pierce County, in the name and by the authority of the State of Washington, do accuse JUSTIN MICHAEL HEGNEY of the crime of MURDER IN THE FIRST DEGREE, committed as follows:

That JUSTIN MICHAEL HEGNEY, in Pierce County, on or about the 19th day of August, 2000, did unlawfully and feloniously, while committing or attempting to commit the crime of ROBBERY IN THE FIRST DEGREE, and in the course of or in furtherance of said crime or in immediate flight therefrom, JUSTIN MICHAEL HEGNEY *or an accomplice*, did cause the death of Erik M. Toews, a human being, not a

participant in such crime, on or about the 25th day of August, 2000, contrary to RCW 9A.32.030(1)(c) and 9A.08.020, and against the peace and dignity of the State of Washington.

State's Resp. to Personal Restraint Pet. (PRP), App. B (emphasis added).[3] In addition, the statement of probable cause supporting the information alleged that Hegney and "a group of individuals to include defendants [Hegney, Hunt, and Hernandez]" committed the offense.[4] State's Resp. to PRP, App. B.

¶13 In *Brown*, the information and statement of probable cause alleged that defendant Christiansen conspired with 11 *specifically identified* people to commit theft; the information did not allege that Christiansen had conspired with some other unnamed coconspirator. *Brown*, 45 Wn. App. at 573-74, 576. The to-convict instruction, however, allowed the jury to find Christiansen guilty if he agreed with "one or more persons" to engage in the conduct at issue. *Brown*, 45 Wn. App. at 574 n.2. Because several witnesses not named in the information testified at trial about their involvement in the conspiracy, thereby allowing the jury to return a guilty verdict by finding Christiansen conspired with one of the uncharged witnesses, Division One of this court determined that the erroneous instruction was not harmless. *Brown*, 45 Wn. App. at 576 (citing *State v. Valladares*, 99 Wn.2d 663, 664 P.2d 508 (1983)).

¶14 Although the information here listed only Hernandez and Hunt as *codefendants*, it did not allege that Hernandez and Hunt were the *only* accomplices. In fact, the information alleged that Hegney or *an accomplice* committed the offense. Additionally, the statement of probable cause did not purport to name every individual involved in the offense. Instead, it clearly stated that Hegney, Hernandez, and Hunt were among "a *group* of individuals." State's

---

[3] The information also charged petitioner in the alternative with second degree felony murder based on the second degree assault of the victim. Because petitioner was convicted of first degree murder, this alternative charge is not at issue.

[4] The statement of probable cause also alleged that several other individuals, including Jamar Spencer, "Neely," and "the Hernandez brothers" were involved in the offense. *See* State's Resp. to PRP, App. B.

Resp. to PRP, App. B (emphasis added). Because the charging documents did not assert that the *only* other individuals involved in the offense were Hunt and Hernandez, Hegney fails to establish that the to-convict instruction allowed the jury to convict him of an uncharged crime.

## C. Unanimity

¶15 Hegney also claims that the to-convict instruction "allowed the twelve jurors to split amongst themselves as to which defendant (and which accomplices) committed the charged acts." Br. of Pet'r at 19. He contends that this instruction violated his constitutional right to jury unanimity.

¶16 But a jury is not required to determine which participant acted as a principal and which participant acted as an accomplice. *State v. Hoffman*, 116 Wn.2d 51, 104-05, 804 P.2d 577 (1991). The jury need only conclude unanimously that both the principal and accomplice participated in the crime. *Hoffman*, 116 Wn.2d at 104-05. Thus, an instruction requiring the jury to be unanimous as to whether Hegney acted as a principal or as an accomplice was not required. In any case, if the jury concluded that Hegney acted as an accomplice, the identity of the principal would be irrelevant to his guilt. Accordingly, this argument fails.

## D. Ineffective Assistance of Counsel

¶17 Hegney also argues that he received ineffective assistance from both his trial and appellate counsel because they failed to challenge the to-convict instruction on the above grounds. To establish ineffective assistance of counsel, Hegney must show that (1) his counsel's performance was deficient and (2) this deficient performance was prejudicial. *In re Pers. Restraint of Woods*, 154 Wn.2d 400, 420-21, 114 P.3d 607 (2005). Counsel's performance is deficient when it falls below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998). Prejudice occurs when, but for

the deficient performance, there is a reasonable probability that the outcome would have differed. *In re Pers. Restraint of Pirtle*, 136 Wn.2d 467, 487, 965 P.2d 593 (1998).

¶18 Because none of the above arguments has merit, Hegney fails to establish that either his trial or appellate counsel were deficient for failing to object to the to-convict instruction on these grounds. Therefore, his ineffective assistance claim fails.

### III. Juvenile Declination Procedure

¶19 Hegney next contends that Washington's juvenile declination procedure violated his: (1) Sixth Amendment right to a jury trial, (2) Fourteenth Amendment right to equal protection of the law, and (3) Fifth Amendment privilege against self-incrimination and Sixth Amendment right to confrontation. We disagree.

### A. Sixth Amendment Right to a Jury Trial

¶20 Hegney claims that the juvenile court's decision to decline juvenile jurisdiction violated his Sixth Amendment right to a jury trial under *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), because it effectively raised the maximum sentence he was exposed to based on findings made by the trial court using the preponderance of the evidence standard rather than findings made by a jury using the beyond a reasonable doubt standard.[5]

¶21 In *Apprendi*, the Supreme Court held that, with the exception of a defendant's prior convictions, "any [disputed] fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. In *Blakely*, the Supreme Court clarified that, for purposes of *Apprendi*, the "statutory maximum" is the

---

[5] Petitioner's direct appeal was mandated in December 2004, after the Supreme Court decided *Blakely*.

maximum term of imprisonment that a trial court may impose *"solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely*, 542 U.S. at 303.

¶22 Hegney claims that, under the reasoning of *Apprendi* and *Blakely*, the juvenile court's decision to decline juvenile jurisdiction "effectively raised the maximum sentence . . . from just under 6 years . . . to life, with a mandatory minimum sentence of 20 years." Br. of Pet'r at 24-25. Because this decision exposed him to a greater potential penalty, Hegney contends that the juvenile court had no authority to decline juvenile jurisdiction unless the State proved, to a jury, beyond a reasonable doubt, that he was not amenable to treatment as a juvenile.

¶23 In addition, he argues that we should not follow *State v. H.O.*, 119 Wn. App. 549, 551-56, 81 P.3d 883 (2003), *review denied*, 152 Wn.2d 1019 (2004), because: (1) it was decided "on an analysis that was rejected by <u>Blakely</u>" and (2) it wrongly concluded that "<u>Apprendi</u> could be avoided by casting the decline determination as a mere 'jurisdictional determination.' "[6] Br. of Pet'r at 27.

¶24 In *H.O.*, the defendant argued that *Apprendi* and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002),[7] required that "a juvenile court use the 'beyond a reasonable doubt' standard to determine whether to decline jurisdiction over a juvenile charged with a crime." *H.O.*, 119 Wn. App. at 552. But Division One of this court ruled that *Apprendi* and *Ring* do not require that "Washington courts depart from the well-established principle that the 'preponderance of the evidence' standard applies to" a decline hearing. *H.O.*, 119 Wn. App. at 552.

---

[6] He also argues that we should not follow *State v. Jacobson*, 33 Wn. App. 529, 656 P.2d 1103 (1982), *review denied*, 99 Wn.2d 1010 (1983), for the same reasons.

[7] In *Ring*, the Supreme Court extended *Apprendi* to capital cases, holding that the Sixth Amendment to the United States Constitution requires the jury to determine the existence of any aggravating circumstance upon which a capital sentence is based. *Ring*, 536 U.S. at 609.

¶25 Relying on *State v. Jacobson*, 33 Wn. App. 529, 656 P.2d 1103 (1982), *review denied*, 99 Wn.2d 1010 (1983), Division One reasoned that a decline hearing "determined, not ultimate guilt or innocence, but the forum in which guilt or innocence was to be found." *H.O.*, 119 Wn. App. at 553. And the court further stated:

> We do not read *Apprendi* and *Ring* as broadly as does H.O. In those cases, either the guilt or the sentence of an accused was at issue. Neither guilt nor sentencing is at issue at the decline hearing. Rather, the hearing is designed to determine whether the case should be heard in juvenile or adult court. Neither of these cases requires that this jurisdictional determination, intended only to determine the appropriate forum for trial, must be supported by the "beyond a reasonable doubt" standard. All that is required is sufficient evidence for a judge to make the discretionary determination whether to retain or transfer jurisdiction of the case.

*H.O.*, 119 Wn. App. at 554-55 (footnote omitted).

¶26 In *State v. Meade*, 129 Wn. App. 918, 925-26, 120 P.3d 975 (2005), we recently held that *Blakely* is inapplicable to juvenile proceedings because juveniles have no right to a jury trial in proceedings under the Juvenile Justice Act of 1977, chapter 13.40 RCW. But to date, Washington courts have not decided whether under *Blakely* a jury must find beyond a reasonable doubt that a defendant is not amenable to treatment as a juvenile before the juvenile court may decline juvenile jurisdiction. Nevertheless, the Alaska Cou rt of Appeals already considered such a question in *Alaska v. Kalmakoff*, 122 P.3d 224, 227-28 (Alaska 2005), *cert. denied*, 127 S. Ct. 404 (2006). Relying on an overwhelming weight of authority from different jurisdictions, the *Kalmakoff* court found that all but one decision concluded that the reasoning of *Apprendi* does not apply to juvenile waiver proceedings. *Kalmakoff*, 122 P.3d at 227 n.29. It then stated:

> While this certainly does not establish that the United States Supreme Court will not reach a different conclusion following its decision in *Blakely*, the overwhelming weight of authority at

this time concludes that *Apprendi* does not apply to juvenile waiver hearings. In general, these courts have held that *Apprendi* does not apply to a juvenile waiver proceeding because it is not a sentencing proceeding, but rather a determination of the court's jurisdiction. And the reasoning of these decisions that juvenile waiver hearings are not sentencing proceedings and therefore not governed by *Apprendi*, appears to foreshadow that courts will not arrive at a different decision following *Blakely*.

*Kalmakoff*, 122 P.3d at 227.

¶27 We agree with the Alaska Court of Appeals and Division One of this court that *Apprendi* and *Blakely* do not apply to a juvenile decline hearing.

### B. Fourteenth Amendment Right to Equal Protection of the Law

¶28 Hegney contends that "it is completely arbitrary and irrational to utilize a preponderance of the evidence standard to decline a child, while using a reasonable doubt standard in the manifest injustice context." Br. of Pet'r at 31. He explains:

> Here, the classification involves 15 year old children charged with First Degree Murder. Some of these children remain in the juvenile system for rehabilitation, and can be held beyond the standard range, until their 21st birthdays, but only through the use of the reasonable doubt standard. Other children, like Mr. Hegney, are bound over to the punitive adult system, where they face life in an adult prison, with a mandatory minimum sentence of 20 years, but only with a standard of proof of preponderance of the evidence.

Br. of Pet'r at 29-30 (footnote omitted).

¶29 While Hegney conflates determinations of guilt and determinations of sentencing with determinations of jurisdiction, it appears that he is arguing that RCW 13.40.110,[8] and the decline hearings thereunder, violate

---

[8] Under RCW 13.40.110(2), the juvenile court can "transfer" its jurisdiction to the criminal division of the superior court "upon a finding that the declination

federal and state equal protection guaranties because it is "arbitrary and irrational" for the juvenile court to retain juvenile jurisdiction over some 15-year-old children charged with first degree murder, but to decline juvenile jurisdiction over other 15-year-old children charged with first degree murder. Br. of Pet'r at 31. We disagree.[9]

¶30 Equal protection requires that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.[10] U.S. CONST. amend. XIV, § 1; WASH. CONST. art. I, § 12; *State v. Coria*, 120 Wn.2d 156, 169, 839 P.2d 890 (1992). Equal protection is not intended to provide complete equality among individuals or classes; rather, it is intended to provide equal application of the laws. *State v. Simmons*, 152 Wn.2d 450, 458, 98 P.3d 789 (2004). Traditionally, courts have used three tests to determine whether this right to equal treatment has been violated: (1) the "rational relationship" test, (2) the " 'intermediate scrutiny' " test, and (3) the "strict scrutiny" test. *State v. Schaaf*, 109 Wn.2d 1, 17, 743 P.2d 240 (1987) (quoting *State v. Phelan*, 100 Wn.2d 508, 512, 671 P.2d 1212 (1983)).

¶31 Courts use the strict scrutiny test if an allegedly discriminatory statutory classification affects a

would be in the best interest of the juvenile or the public." In exercising this discretion under RCW 13.40.110, the juvenile court should consider the eight "determinative factors" that the Supreme Court set forth in *Kent v. United States*, 383 U.S. 541, 566, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966). *State v. Williams*, 75 Wn.2d 604, 606-07, 453 P.2d 418 (1969). In Hegney's direct appeal, we already addressed the *Kent* factors and the trial court's factual determinations regarding these factors. *See Hegney*, 2004 Wash. App. LEXIS 682, at *10-13.

[9] It also appears that Hegney is arguing that RCW 13.40.110 violates federal and state substantive due process guaranties. Although he makes a substantive due process challenge, he has not informed us of the nature of the right involved. Therefore, we decline to address this argument. *See State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992) (Parties raising constitutional issues must present considered arguments to this court.). We reiterate our previous position: naked castings into the constitutional sea are not sufficient to command judicial consideration and discussion.

[10] Our Supreme Court has "consistently construed the federal and state equal protection clauses identically and considered claims arising under their scope as one issue." *State v. Manussier*, 129 Wn.2d 652, 672, 921 P.2d 473 (1996), *cert. denied*, 520 U.S. 1201 (1997).

suspect class or a fundamental right. *State v. Osman*, 157 Wn.2d 474, 484, 139 P.3d 334 (2006). Courts use the intermediate scrutiny test if gender-based classifications are at issue or if an allegedly discriminatory statutory classification affects a "semisuspect" class and an "important" right. *Osman*, 157 Wn.2d at 484; *Schaaf*, 109 Wn.2d at 17-18; *Phelan*, 100 Wn.2d at 514.

¶32 Although Hegney asks us to apply either the strict scrutiny or the intermediate scrutiny test to his equal protection challenge, we decline to do so. First, juveniles are not members of a suspect class or a semisuspect class for equal protection purposes. *Schaaf*, 109 Wn.2d at 19. When neither a suspect class nor a semisuspect class is at issue in an equal protection challenge, the rational relationship test applies. *State v. Blilie*, 132 Wn.2d 484, 493, 939 P.2d 691 (1997). Second, while physical liberty is an important right, it is not a fundamental right. *Phelan*, 100 Wn.2d at 514; *see also State v. Danis*, 64 Wn. App. 814, 818-20, 826 P.2d 1096, *review denied*, 119 Wn.2d 1015 (1992). "[W]hen physical liberty is the sole interest involved in a statutory classification, the rational relationship test applies." *Blilie*, 132 Wn.2d at 493-94. Therefore, we apply the rational relationship test.

¶33 Our Supreme Court has defined this test as follows:

> The rational relationship test is the most relaxed and tolerant form of judicial scrutiny under the equal protection clause. Under this test, the legislative classification will be upheld unless it rests on grounds wholly irrelevant to achievement of legitimate state objectives. The burden of proving the legislative classification unconstitutional is upon the party challenging the legislation. That party has the heavy burden of overcoming a presumption that the statute is constitutional.

*State v. Shawn P.*, 122 Wn.2d 553, 561, 859 P.2d 1220 (1993) (footnotes omitted).

¶34 Applying this standard, RCW 13.40.110, and the decline hearings thereunder, do not violate the federal and

state equal protection clauses. After all, decline hearings are not prosecutorial in nature. *State v. Piche*, 74 Wn.2d 9, 14, 442 P.2d 632 (1968), *cert. denied*, 393 U.S. 1041 (1969). Rather, "the sole purpose of a decline hearing 'is to determine whether the best interests of the child and of society would be served by the retention of the juvenile court authority over him or whether the juvenile, under all the circumstances, should be transferred to be tried as an adult.'" *State v. M.A.*, 106 Wn. App. 493, 503-04, 23 P.3d 508 (2001) (internal quotation marks omitted) (quoting *In re Welfare of Harbert*, 85 Wn.2d 719, 725, 538 P.2d 1212 (1975)). And in making this determination, the juvenile court must consider (1) the juvenile's past, future, state of mind, and actions and (2) society's safety, needs, and demands. *M.A.*, 106 Wn. App. at 504; *accord Kent v. United States*, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966).

¶35 Clearly, it is rational for the juvenile court to retain jurisdiction over some juveniles after determining that it is in the best interests of these juveniles and the best interests of society. Likewise, it is rational for the juvenile court to decline jurisdiction over other juveniles after determining that it is not in the best interests of those juveniles and the best interests of society. RCW 13.40.110, and the decline hearings thereunder, "serve the needs of the community and the juvenile while retaining the features of informality and individualized attention." *Schaaf*, 109 Wn.2d at 22. And again, we emphasize that equal protection is not intended to provide complete equality among similarly situated juveniles who are charged with crimes; rather, it is intended to provide equal application of RCW 13.40.110, and the decline hearings thereunder. Thus, individual results may vary. As this law easily passes the rational relationship test, it does not, therefore, violate the federal and state equal protection clauses.

 C. Fifth Amendment Privilege against Self-Incrimination and Sixth Amendment Right to Confrontation

¶36 Hegney argues that RCW 13.40.110, and the decline hearings thereunder, "set up the situation in this case

where evidence was admitted at the decline hearing, and used against Mr. Hegney, that later the same court determined to be inadmissible." Br. of Pet'r at 32. He argues that such a procedure violated his constitutional rights, namely his Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to confrontation. We do not agree.

¶37 As previously stated, a decline hearing is not prosecutorial in nature. *Piche*, 74 Wn.2d at 14. And unlike a criminal proceeding that focuses on an act, the juvenile proceeding focuses attention on the actor. *Harbert*, 85 Wn.2d at 726.

> "Unlike a typical criminal action, a juvenile waiver proceeding vests the judge with a wide amount of discretion in making his determination. In his decision making, the juvenile judge does not simply deal with a specific factual incident in the accused's life as does a criminal court judge, but rather the juvenile judge must consider the juvenile's past, his future, his mind, and his acts and then balance these factors against the safety, needs, and demands of society. Further, besides judging the 'whole man' as opposed to the act with wide as opposed to limited discretion, the juvenile judge may perform his task in a comparatively informal proceeding."

*Harbert*, 85 Wn.2d at 726 (quoting *Miller v. Quatsoe*, 332 F. Supp. 1269, 1275 (E.D. Wis. 1971)).

¶38 Hegney's Fifth Amendment challenge to the admission of his statement to the police into evidence is without merit. Under RCW 13.40.110, and the decline hearings thereunder, the guilt or innocence of a juvenile is not at issue. *Harbert*, 85 Wn.2d at 728. The procedure itself cannot lead to a juvenile's loss of liberty. *Harbert*, 85 Wn.2d at 728. And any statements by the juvenile would be relevant for determining the best interests of the child and of society. *Harbert*, 85 Wn.2d at 728. Therefore, even improperly obtained statements by the police are admissible at a decline hearing, even though they would not be admissible at the substantive trial. *Harbert*, 85 Wn.2d at 728; *see also State v. Ramer*, 151 Wn.2d 106, 110 n.1, 86

P.3d 132 (2004); *State v. Linares*, 75 Wn. App. 404, 407-08, 880 P.2d 550 (1994).

▮ ¶39 And Hegney's Sixth Amendment challenge to the admission of hearsay evidence is without merit. The Sixth Amendment right to confrontation specifically applies to criminal prosecutions. *Harbert*, 85 Wn.2d at 726 (citing *Clemons v. State*, 162 Ind. App. 50, 317 N.E.2d 859, 865 n.10 (1974), *cert. denied*, 423 U.S. 859 (1975)). Because the guilt or innocence of a juvenile is not at issue in a decline hearing, the Sixth Amendment is inapplicable here. *Harbert*, 85 Wn.2d at 726 (citing *Clemons*, 317 N.E.2d at 865 n.10). Moreover, fundamental fairness at a juvenile proceeding does not require the exclusion of hearsay evidence. *Harbert*, 85 Wn.2d at 726-27; *see also Clemons*, 317 N.E.2d at 864-66. Thus, under RCW 13.40.110, and the decline hearings thereunder, the technical rules for the exclusion of evidence do not apply and hearsay is generally admissible. *Piche*, 74 Wn.2d at 11; *Sheppard v. Rhay*, 73 Wn.2d 734, 738, 440 P.2d 422 (1968).

¶40 Nevertheless, Hegney argues that this "scheme" has inherent problems. Br. of Pet'r at 31. Specifically, he claims that "once a juvenile is declined to adult court on a particular charge, there is no procedure for bringing the child back to juvenile court since the child no longer meets the statutory definition of a juvenile." Br. of Pet'r at 31. He is incorrect.

▮ ¶41 The adult criminal court acquires jurisdiction to hear juvenile cases only when the juvenile court properly "transfers jurisdiction"—i.e., transfers the power to hear and determine controversies involving juveniles. RCW 13.04.030(1)(e)(i); RCW 13.40.110(2); *State v. Pritchard*, 79 Wn. App. 14, 20, 900 P.2d 560 (1995), *review denied*, 128 Wn.2d 1017 (1996). If a juvenile court erroneously declines jurisdiction, an adult criminal court lacks jurisdiction to enter a judgment and sentence. *Pritchard*, 79 Wn. App. at 20.

¶42 Where a party has demonstrated, in appropriate postconviction proceedings,[11] that such a transfer order has been faulty, the court can afford proper relief by holding a hearing as to the propriety of the challenged transfer. *See Dillenburg v. Maxwell*, 70 Wn.2d 331, 413 P.2d 940, 422 P.2d 783 (1966), *cert. denied*, 386 U.S. 998 (1967). Depending on the age of the convicted person, either the adult criminal court or the juvenile court will determine whether the facts before the juvenile court warranted and justified the transfer for criminal prosecution. *Dillenburg*, 70 Wn.2d at 355. Further relief then depends on whether the convicted person is still under the age of 18 years at the time of the court's determination. *Dillenburg*, 70 Wn.2d at 355-56; *see also State v. Ring*, 54 Wn.2d 250, 339 P.2d 461 (1959).

¶43 Thus, Hegney would not be "left remediless" to challenge the decline hearing. Br. of Pet'r at 32.

IV. Vacation of Juvenile Court's Decision To Decline
Juvenile Jurisdiction

¶44 Hegney argues that we should vacate the juvenile court's decision to decline juvenile jurisdiction either because of (1) newly discovered evidence or (2) ineffective assistance of counsel. We disagree with both arguments.

¶45 First, in preparing this personal restraint petition, Hegney's appellate counsel found "a packet of CPS [Child Protective Services] documents" from the Department of Social and Health Services (DSHS) in trial counsel's files. Ex. 22, at 2. DSHS had prepared these records at the request of Tara Varela, Hegney's probation officer. Among other things, the CPS records contained (1) allegations of sexual abuse by Hegney, (2) concerns for family counseling, (3) allegations of physical abuse/neglect by the parents, (4) allegations that Hegney's father had sexually abused a child, and (5) allegations of drug and alcohol abuse by various family members.

---

[11] A transfer order is not appealable as a matter of right until the conclusion of the adult criminal matter. *In re Welfare of Lewis*, 89 Wn.2d 113, 115, 569 P.2d 1158 (1977).

¶46 Varela requested the CPS records from DSHS on February 12, 2001, the same day that the juvenile court convened the decline hearing. Although Varela requested the CPS records in preparing for the decline hearing, she also stated that "this . . . can take several weeks before obtaining. As such we do not rely on the obtaining of such information for decline hearings." State's Resp. to PRP, App. K. Thereafter, on February 14, 2001, Varela testified at the decline hearing.

¶47 Sometime "around" February 23, 2001, Varela received the requested CPS records from DSHS. State's Resp. to PRP, App. K. She claims that she provided a copy of them to Hegney's trial counsel sometime "prior" to March 2, 2001, when the juvenile court entered its findings of fact and conclusions of law regarding the decline hearing. State's Resp. to PRP, App. K. But Hegney's trial counsel claims, "I do not know when I received them nor do I recall why these documents were not obtained earlier." Ex. 22, at 2.

¶48 Second, Hegney's appellate counsel has provided us with a "neuropsychological evaluation" of Hegney.[12] Ex. 25. Hegney's counsel claims that this evaluation "shows mild to moderate impairment of neuropsychological abilities, consistent with Justin having suffered a closed head injury in the past." Br. of Pet'r at 35.

A. Newly Discovered Evidence

¶49 As an initial matter, Hegney claims, "There is no explanation for the failure of the State to disclose the DSHS records to the defense *prior* to Feb. 20, 2001." Br. of Pet'r at 35. He suggests that this failure violated the State's constitutional obligation to disclose exculpatory evidence. We disagree.

¶50 The prosecuting attorney is under a duty to disclose and to preserve evidence that is material to guilt or punishment and favorable to the defendant, and a failure to do so generally will be held to violate the accused's consti-

---

[12] This evaluation was performed after Hegney's direct appeal.

tutional right to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *State v. Coe*, 101 Wn.2d 772, 783, 684 P.2d 668 (1984); *State v. Renfro*, 28 Wn. App. 248, 251, 622 P.2d 1295 (1981), *aff'd*, 96 Wn.2d 902, 639 P.2d 737, *cert. denied*, 459 U.S. 842 (1982); *see also* CrR 4.7.

¶51 But the prosecutor's duty "is limited to material and information within the knowledge, possession or control of members of the prosecuting attorney's staff." CrR 4.7(a)(4). Here, the prosecutor did not request, did not possess, did not know of, and did not control the CPS documents. Instead, the probation officer and/or DSHS possessed and controlled the CPS documents. Therefore, under the rationale of *State v. Frederick*, 32 Wn. App. 624, 627, 648 P.2d 925 (1982), *rev'd on other grounds*, 100 Wn.2d 550, 674 P.2d 136 (1983), the prosecutor had no duty to disclose the CPS records.

¶52 In any case, newly discovered evidence is grounds for relief in a personal restraint petition if those facts "in the interest of justice require vacation of the conviction, sentence, or other order." RAP 16.4(c)(3); *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 319, 868 P.2d 835, *cert. denied*, 513 U.S. 849 (1994). The standard under RAP 16.4(c)(3) is the same standard as applied to motions for a new trial made on the same ground. *Lord*, 123 Wn.2d at 319. Under that test, the defendant must show that the evidence: (1) will probably change the result of the trial, (2) was discovered since the trial, (3) could not have been discovered before trial by the exercise of due diligence, (4) is material, and (5) is not merely cumulative or impeaching. *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981). The absence of any one of the five factors is grounds for denying relief. *Williams*, 96 Wn.2d at 223.

¶53 Even assuming, without deciding, that the CPS records and the neuropsychological evaluation could not have been discovered before the decline hearing by the exercise of due diligence, they would not change the result of the decline hearing.

¶54 Hegney argues that the newly discovered CPS records[13] and neuropsychological evaluation are relevant to refute the juvenile court's findings of fact regarding the following two *Kent* factors: (1) the sophistication and maturity of the juvenile and (2) the prospects for adequate protection of the public and the likelihood of reasonable rehabilitation of the juvenile. Reply Br. of Pet'r at 16-17. He claims that the newly discovered evidence would have shown the juvenile court that his "problems" were "the result of a combination of brain damage, possible Post-Traumatic Stress Disorder, and the effects of growing up in households filled with violence and dysfunction." Br. of Pet'r at 35.

¶55 Even before the decline hearing, Hegney's expert, Karil Klingbeil, suspected that Hegney was raised in abusive households. But she notes, "I was never given any data or information that confirmed my suspicions. Kristina Myers (Justin's older sister) never told me about any physical or emotional abuse that took place in her mother's home, and I never received any DSHS/CPS records to review." Ex. 23, at 2. Thus, she claims, "Had I known all of this information in 2001, when I testified, I would have been able to stress to the court, more than I did, that Justin was immature, and that he was not fully culpable for his participation in the robbery and murder of Mr. Toews." Ex. 23, at 4.

¶56 Moreover, Hegney's trial counsel "counted" on Klingbeil to interview the family members. Ex. 22, at 2. He stated:

> I believe she interviewed Kristina Myers, but I did not know that Ms. Myers was going through withdrawal from drugs and did not know that she did not tell Ms. Klingbeil accurate information about abuse in the Hegney/Campbell home. To my knowledge Jeremy Hegney, Justin Hegney's older brother, was not interviewed.

---

[13] For the most part, the recent declarations from Hegney's brother and sister reinforce the CPS records.

Had I known of the abuse documented in the CPS files before the declination hearing or the abuse as related by Jeremy Hegney and Kristina Myers, I would have relayed this information to Ms. Klingbeil. I also would have introduced this evidence before Judge Strombom.

Ex. 22, at 2-3.

¶57 While the CPS records certainly expose Hegney's "family problems," they do not refute the juvenile court's findings of fact with regard to the above *Kent* factors. 4 Report of Proceedings (RP) (Feb. 20, 2001) at 646. They do not refute that "[Hegney's] personal life, unknown apparently to his parents, involved the use of alcohol, cigarettes, marijuana and sexual activity." 4 RP at 645-46. They do not refute that "[Hegney] was a leader in certain groups and a follower in others." 4 RP at 646. They do not refute "[Hegney's] ability to manipulate situations and people." 4 RP at 649. They do not refute that "[Hegney] was not following the rules of either parent." 4 RP at 646. They do not refute that "[Hegney's] actions were of a young person who wanted to be an adult and who did things he considered to be adult." 4 RP at 646. And finally, they do not refute that "[Hegney] has been a danger and has been involved with dangerous friends." 4 RP at 648.

¶58 If anything, the CPS records reinforce the juvenile court's findings of fact with regard to these *Kent* factors. After all, the CPS records reveal that a classmate accused Hegney of sexual abuse. And the CPS records reveal that Hegney was "OUT OF CONTROL. HE IS ANGRY ALL THE TIME, NEVER MINDS, TREATS OTHERS BADLY, NO FEAR OF [MOTHER], ALWAYS ARGUES AND YELLS, AND GETTING WORSE." Ex. 19 (Referral ID - 180567).

¶59 And while Hegney claims that the neuropsychological examination shows that he "has suffered some type of head injury in the past which caused mild brain damage," this examination also does not refute any of the juvenile court's findings of fact with regard to the above *Kent* factors. Reply Br. of Pet'r at 18. In fact, the examination also notes that Hegney "will probably not experience significant prob-

lems with daily function and adaptive abilities. He will likely not demonstrate significant difficulty in problem solving and reasoning." Ex. 25, at 6-7. Thus, the neuropsychological examination is equivocal.

## B. Ineffective Counsel

¶60 Alternatively, Hegney argues that he received ineffective assistance from his counsel because he failed (1) to obtain the CPS records, (2) to investigate the family problems, and (3) to obtain a neuropsychological examination.

¶61 Even assuming, without deciding, that Hegney's counsel was deficient, no prejudice occurred because this evidence would not change the result of the decline hearing. Therefore, his ineffective assistance claim fails.

## V. Application of International Law

¶62 Hegney claims that "in light of widespread international law," a juvenile has a right to be tried and punished as a juvenile. Br. of Pet'r at 38. He argues that the International Covenant on Civil and Political Rights, Sept. 8, 1992, 999 U.N.T.S. 171 (ICCPR), a treaty ratified by the United States Senate, should be controlling. We disagree.

¶63 It is undisputed that the ICCPR is a treaty that, among other things, provides, "Juvenile offenders shall be segregated from adults and be accorded treatment appropriate to their age and legal status." ICCPR art. 10, 999 U.N.T.S. at 176. Treaties are the supreme law of the land, incorporated into our domestic law. U.S. CONST. art. VI, cl. 2; *The Paquete Habana*, 175 U.S. 677, 700, 20 S. Ct. 290, 44 L. Ed. 320 (1900); *State v. Pang*, 132 Wn.2d 852, 908, 940 P.2d 1293, 948 P.2d 381, *cert. denied*, 522 U.S. 1029 (1997). They are binding on the states as well as the federal government. U.S. CONST. art. VI, cl. 2; *Pang*, 132 Wn.2d at 908.

¶64 Nevertheless, a treaty such as the ICCPR does not automatically supersede local laws that are inconsistent with it unless the treaty provisions are self-executing. *Fujii*

*v. State*, 38 Cal. 2d 718, 242 P.2d 617, 620 (1952); *see also Foster v. Neilson*, 27 U.S. 253, 314, 7 L. Ed. 415 (1829). In order to determine whether a treaty is self-executing, we must first look to the intent of the signatory parties as manifested by the language of the treaty. *People of Saipan v. U.S. Dep't of Interior*, 502 F.2d 90, 97 (9th Cir. 1974), *cert. denied*, 420 U.S. 1003 (1975); *White v. Paulsen*, 997 F. Supp. 1380, 1385-86 (E.D. Wash. 1998); *Fujii*, 242 P.2d at 620. If the parties' intent is unclear from the language of the treaty, then we must look to the circumstances surrounding its execution. *People of Saipan*, 502 F.2d at 97; *Fujii*, 242 P.2d at 620.

¶65 "In order for a treaty provision to be operative without the aid of implementing legislation and to have the force and effect of a statute, it must appear that the framers of the treaty intended to prescribe a rule that, standing alone, would be enforceable in the courts." *Fujii*, 242 P.2d at 620; *see also People of Saipan*, 502 F.2d at 97.

¶66 But the ICCPR is not self-executing, and Congress has not enacted implementing legislation. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 735, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004) (the United States ratified the ICCPR on the express understanding that it was not self-executing and did not create enforceable obligations); *Beazley v. Johnson*, 242 F.3d 248, 267-68 (5th Cir.) (citing cases and other sources indicating that the ICCPR is not self-executing), *cert. denied*, 534 U.S. 945 (2001); *Hawkins v. Comparet-Cassani*, 33 F. Supp. 2d 1244, 1257 (C.D. Cal. 1999) (noting that Congress has not enacted implementing legislation for the ICCPR), *rev'd on other grounds*, 251 F.3d 1230 (9th Cir. 2001); *In re Extradition of Cheung*, 968 F. Supp. 791, 803 n.17 (D. Conn. 1997) (noting that the Senate ratified the ICCPR with the express proviso that it was not self-executing); 138 CONG. REC. S4781, S4784 (daily ed. Apr. 2, 1992). *But see Ex parte Pressley*, 770 So. 2d 143, 148 (Ala.) (noting that although the Senate declared that the ICCPR was not self-executing, the Senate's intent was to clarify that the ICCPR did not

create a private cause of action), *cert. denied*, 531 U.S. 931 (2000). Therefore, Hegney may not rely on the ICCPR as being incorporated into our domestic law; the ICCPR provisions relied on by Hegney do not operate to invalidate our domestic law. And thus there is no need for us to overrule *State v. Massey*, 60 Wn. App. 131, 803 P.2d 340 (holding that sentence of life imprisonment without parole, applied to a 13-year-old, did not violate the Eighth Amendment), *cert. denied*, 499 U.S. 960 (1991).

VI. Retroactive Application of the 2005 Amendments to RCW 9.94A.540

¶67 Hegney argues that the 2005 amendments to RCW 9.94A.540 should retroactively apply to the 2002 calculation of his offender score. We disagree.

¶68 In 2005, the legislature amended RCW 9.94A.540, stating:

(1) The legislature finds that emerging research on brain development indicates that adolescent brains, and thus adolescent intellectual and emotional capabilities, differ significantly from those of mature adults. It is appropriate to take these differences into consideration when sentencing juveniles tried as adults. The legislature further finds that applying mandatory minimum sentences for juveniles tried as adults prevents trial court judges from taking these differences into consideration in appropriate circumstances.

(2) The legislature intends to eliminate the application of mandatory minimum sentences under RCW 9.94A.540 to juveniles tried as adults, and to continue to apply all other adult sentencing provisions to juveniles tried as adults.

LAWS OF 2005, ch. 437, § 1. Thus, the legislature ensured that the mandatory minimum terms of RCW 9.94A.540(1) "shall not be applied in sentencing of juveniles tried as adults pursuant to RCW 13.04.030(1)(e)(i)." LAWS OF 2005, ch. 437, § 2. The legislature also provided that this prohibition against mandatory minimum sentences for juveniles tried as adults "applies only to crimes committed on or after the effective date of this act." LAWS OF 2005, ch. 437, § 2.

¶69 Absent language indicating a contrary intent, we must apply an amendment to a penal statute—even a patently remedial one—prospectively under RCW 10.01.040. *State v. McCarthy*, 112 Wn. App. 231, 237, 48 P.3d 1014 (2002), *review denied*, 148 Wn.2d 1011 (2003). RCW 10.01.040, also known as the savings clause, in relevant part provides:

> Whenever any criminal or penal statute shall be amended or repealed, all offenses committed or penalties or forfeitures incurred while it was in force shall be punished or enforced as if it were in force, notwithstanding such amendment or repeal, unless a contrary intention is expressly declared in the amendatory or repealing act.

This savings clause is deemed a part of every amending or repealing statute as if the legislature had expressly inserted it therein. *State v. Ross*, 152 Wn.2d 220, 237, 95 P.3d 1225 (2004). Nevertheless, to avoid application of the savings clause, the legislature simply needs to express its intent in words that fairly convey its intention. *Ross*, 152 Wn.2d at 238.

¶70 Here, the legislature has failed to express any intent that the 2005 amendments to RCW 9.94A.540 apply retroactively. In fact, the legislature has expressed the opposite intent by explicitly providing that the 2005 amendments to RCW 9.94A.540 apply on or after the effective date of the act: July 24, 2005. LAWS OF 2005, ch. 437, § 2. Accordingly, we hold that the amendments apply prospectively only.

¶71 Finally, the 2005 amendments to RCW 9.94A.540 do not violate equal protection of the laws. *See Ross*, 152 Wn.2d at 240-41; *In re Pers. Restraint of Stanphill*, 134 Wn.2d 165, 175, 949 P.2d 365 (1998).

## VII. Denial of Early Release Time

¶72 Hegney claims that House Bill 1924, which in 1997 reenacted and amended former RCW 9.94A.120 (1996), violated the single subject requirement of article II, section 19 of the Washington State Constitution. During

oral argument, Hegney abandoned this argument, conceding that Engrossed Third Substitute House Bill (E3SHB) 3900, "AN ACT Relating to offenders," had already reenacted and amended former RCW 9.94A.120. LAWS OF 1997, ch. 338. He also conceded that E3SHB 3900's title did not offend the single subject requirement. We agree. *See generally* Kristen L. Fraser, *Method, Procedure, Means, and Manner: Washington's Law of Law-Making*, 39 GONZ. L. REV. 447, 461 (2003/04).

## VIII. *Crawford* Violation

¶73 Relying on *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), Hegney argues that we should conclude that "the admission of Mr. Hill's statement at the joint trial violated Mr. Hegney's constitutional right to confront witnesses." Br. of Pet'r at 47. We disagree.

¶74 On direct appeal, Hegney already argued that the trial court's admission of Hill's statement[14] violated his constitutional right to confront witnesses. And we already rejected Hegney's argument, relying on *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). But as Hegney notes, our opinion "came out just a few weeks" after *Crawford* and never relied on *Crawford*. Br. of Pet'r at 46-47.

¶75 In personal restraint petitions, we ordinarily will not review issues previously raised and resolved on direct review. *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 388, 972 P.2d 1250 (1999). In order to renew an issue rejected on its merits on appeal, a petitioner must show the ends of justice would be served by reexamining the issue. *In re Pers. Restraint of Vandervlugt*, 120 Wn.2d 427, 432, 842 P.2d 950 (1992). A petitioner can meet this burden by showing an intervening change in the law " 'or some other justification for having failed to raise a crucial point or argument in the prior application.' " *In re Pers. Restraint of*

---

[14] Hill told the police that everyone, except him, had participated equally in the offense.

*Taylor*, 105 Wn.2d 683, 688, 717 P.2d 755 (1986) (quoting *Sanders v. United States*, 373 U.S. 1, 16, 83 S. Ct. 1068, 10 L. Ed. 2d 148 (1963)). Finally, we take seriously that collateral attacks should raise new points of fact and law that were not or could not have been raised in the principal action, to the prejudice of the defendant. *Gentry*, 137 Wn.2d at 388-89.

 ¶76 Because Hegney's direct appeal was pending when the Supreme Court announced *Crawford*, and we did not rely on *Crawford* in our opinion, "the ends of justice would be served" by reexamining this case in light of *Bruton* and *Crawford*. *Vandervlugt*, 120 Wn.2d at 432.

 ¶77 The confrontation clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Article I, section 22 of the Washington State Constitution similarly provides that "[i]n criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face." "Thus, as a threshold matter, there must be a 'witness[ ] against' the accused for the Confrontation Clause to be invoked properly." *Mason v. Yarborough*, 447 F.3d 693, 697 (9th Cir.) (Wallace, J., concurring) (alteration in original), *cert. denied*, 127 S. Ct. 225 (2006).

¶78 In *Crawford*, the Supreme Court held that the confrontation clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' " *Crawford*, 541 U.S. at 51 (quoting 2 Noah Webster, An American Dictionary of the English Language (1828)). And in particular, where a witness is unavailable and out of court "testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 68.

¶79 *Bruton* and its progeny, *Richardson v. Marsh*, 481 U.S. 200, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), and *Gray v. Maryland*, 523 U.S. 185, 118 S. Ct. 1151, 140 L. Ed. 2d

294 (1998), also address whether an admission admitted against one defendant is deemed to be a "'witness[ ] against'" a codefendant, thus invoking the protections of the confrontation clause. *Mason*, 447 F.3d at 698 (Wallace, J., concurring) (alteration in original).

¶80 In *Bruton*, the Supreme Court held that a defendant, Bruton, was deprived of his confrontation rights under the Sixth Amendment when he was "powerfully incriminat[ed]" by a pretrial statement of his codefendant, Evans, who did not take the stand at trial. *Bruton*, 391 U.S. at 135-36. Although the trial court gave the jury a limiting instruction that it could consider the confession only against Evans, the Supreme Court held that "the introduction of Evans'[s] confession posed a substantial threat to [Bruton's] right to confront the witnesses against him, and this is a hazard [the Court] cannot ignore." *Bruton*, 391 U.S. at 137. In other words, "Evans was effectively deemed to be a witness against Bruton, as well as himself, and because of the nature of the confession, this could not be overcome by a limiting instruction." *Mason*, 447 F.3d at 698 (Wallace, J., concurring). Thus, Bruton's confrontation rights under the Sixth Amendment were violated. *Bruton*, 391 U.S. at 135-37.

¶81 In *Richardson*, the trial court tried two defendants, Marsh and Williams. *Richardson*, 481 U.S. at 202. The State introduced the confession of Williams, the codefendant, into evidence. *Richardson*, 481 U.S. at 203. Unlike the confession in *Bruton*, the State redacted Williams's confession so that it contained no reference to Marsh. *Richardson*, 481 U.S. at 203. And the trial court admonished the jury not to use Williams's confession against Marsh. *Richardson*, 481 U.S. at 204.

¶82 The Supreme Court in *Richardson* held that " '[o]rdinarily, a witness whose testimony is introduced at a joint trial is *not considered to be a witness "against" a defendant* if the jury is instructed to consider that testimony only against a codefendant.' " *Mason*, 447 F.3d at 698 (Wallace, J., concurring) (alteration in original) (quoting *Richardson*,

481 U.S. at 206). And the Supreme Court based this holding on "the almost invariable assumption of the law that jurors follow their instructions." *Richardson*, 481 U.S. at 206; *Mason*, 447 F.3d at 698 (Wallace, J., concurring). In other words, the Supreme Court concluded that the redaction and limiting instructions effectively prevented Williams from being a "'witness[ ] against'" Marsh; and therefore, the protections of the confrontation clause were not at issue. *Mason*, 447 F.3d at 698 (Wallace, J., concurring) (alteration in original).

¶83 In *Gray*, the State introduced a redacted confession of Bell, the codefendant, into evidence at trial. *Gray*, 523 U.S. at 188-89. And the trial court gave a limiting instruction. *Gray*, 523 U.S. at 189. But the State merely redacted Bell's confession "by substituting for the defendant's name in the confession a blank space or the word 'deleted.' " *Gray*, 523 U.S. at 188. The Supreme Court held, "The blank space in an obviously redacted confession also points directly to the defendant, and it accuses the defendant in a manner similar to Evans'[s] use of Bruton's name or to a testifying codefendant's accusatory finger." *Gray*, 523 U.S. at 194. Thus, this confession also fell "within the class of statements to which *Bruton*'s protections apply." *Gray*, 523 U.S. at 197. "Therefore, the Supreme Court implicitly held that Bell's confession made Bell a witness against Gray, entitling him, under *Bruton*, to confront Bell." *Mason*, 447 F.3d at 699 (Wallace, J., concurring).

¶84 Although *Crawford* heightened the standard under which a witness's statements can be admitted, it did not overrule *Bruton*, *Richardson*, and *Gray*. See *Crawford*, 541 U.S. at 57-58. Reading these cases together, *Bruton*, *Richardson*, and *Gray* all answer the threshold question posed in *Crawford* of when an admission by one defendant can be considered a "'witness[ ] against'" another defendant in a joint trial. *Mason*, 447 F.3d at 699 (Wallace, J., concurring) (alteration in original).

¶85 Here, Hill's admis sion cannot be considered a " 'witness[ ] against' " Hegney. *Mason*, 447 F.3d at 699

(Wallace, J., concurring) (alteration in original). After all, in Hegney's direct appeal, we found that Hill's statements: (1) did not refer to Hegney by name or otherwise, (2) did not contain any blanks or obvious deletions, and (3) were accompanied by a limiting instruction.[15] In other words, these redactions and limiting instructions effectively prevented Hill from being a "'witness[ ] against'" Hegney, and the protections of the confrontation clause were not at issue. *Mason*, 447 F.3d at 699 (Wallace, J., concurring) (alteration in original). Therefore, Hegney's confrontation clause rights were not violated.

IX. Reconsideration of Direct Appeal

¶86 In his personal restraint petition, Hegney asks us to reconsider the following issues that we decided in his direct appeal: (1) whether the evidence was sufficient, (2) whether the trial court erred in not granting a change of venue, (3) whether the trial court properly instructed the jury on accomplice liability, (4) whether the prosecutor committed misconduct, and (5) whether the trial court erred in admitting evidence under ER 404. But Hegney does not give us any reasons why we should reconsider. Thus, we do not reconsider these issues.

¶87 Accordingly, this petition is denied.

QUINN-BRINTNALL and PENOYAR, JJ., concur.

---

[15] Hill's admissions in this case may have become incriminating when linked with other evidence introduced at trial. That the jury could make such an inference does not mean, however, that the admissions were otherwise inadmissible. *Richardson*, 481 U.S. at 208-09; *State v. Larry*, 108 Wn. App. 894, 905-07, 34 P.3d 241 (2001), *review denied*, 146 Wn.2d 1022 (2002).