FILED
JUNE 28, 2018
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 33910-6-III |
| | ) | (consolidated with |
| Respondent, | ) | No. 33932-7-III) |
| | ) | |
| v. | ) | |
| | ) | |
| ADAM S. JENNINGS, | ) | |
| | ) | |
| Appellant. | ) | UNPUBLISHED OPINION |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN WAYNE JENNINGS, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — John Jennings appeals his convictions for first degree

murder and delivery of a firearm to an ineligible person. Adam Jennings, John's son,

appeals his convictions for first degree murder and unlawful possession of a firearm.

Both men argue that insufficient evidence supports their convictions, their right to

conflict-free counsel was violated, prosecutorial misconduct during closing arguments, and cumulative error. We reverse John's conviction for delivery of a firearm to an ineligible person, but otherwise affirm all convictions.

FACTS

On September 2, 2013, Michael Carrigan was shot and killed while hunting in northern Okanogan County. This appeal involves the murder trial for his death.

On November 18, 2013, the State charged John and Adam Jennings with premeditated first degree murder, each carrying a firearm enhancement. The State also charged John with unlawful delivery of a firearm to an ineligible person and Adam with unlawful possession of a firearm. On November 19, 2015, Adam stipulated he was convicted of a serious offense and thus ineligible to possess or control a firearm. The following facts were presented at the Jennings's joint jury trial.

1.    TRIAL TESTIMONY AND VERDICT

George Stover, a family member and longtime hunting partner of Mr. Carrigan, was first to testify. In September 2013, Mr. Stover went grouse hunting and deer scouting in a small group: himself, Mr. Carrigan, and Mr. Carrigan's brother. They drove six hours to the Pontiac Ridge area in northeastern Okanogan County and stayed in a cabin there. Mr. Stover and Mr. Carrigan went out to hunt and scout in their vehicle. Around

2

7:00 p.m. that evening, about one mile from their cabin, they passed by Cow Camp Road, and Mr. Carrigan saw a grouse in a large meadow. He stopped the car, walked into the meadow, and shot at the grouse. He fired one shot, the grouse began to fly away, and he then fired a second shot. Mr. Stover stayed in the truck.

Almost immediately after Mr. Carrigan's second shot, Mr. Stover heard a gunshot from a cabin behind him. Mr. Carrigan was hit by the gunshot and fell to the ground. Mr. Stover looked at the cabin but did not see the shooter. He stayed in the truck. Mr. Carrigan began to get up and walk back to the truck. Another shot was fired from the cabin. That shot also hit Mr. Carrigan. He dropped to his knees and rolled onto his back. Mr. Stover drove away to get help, sitting as far back in his truck as possible when he drove past the cabin. When Mr. Stover came back with law enforcement, he helped officers find Mr. Carrigan in the meadow. Mr. Carrigan was dead.

Around 8:30 p.m., officers using a loudspeaker directed anyone in the cabin to come out. John and Adam came out. Officers saw no evidence of any other people near the field.

Directly after coming out of the house, and in response to law enforcement's questions, John told officers that he was making tea when he heard the shots and got on

the floor.  He also told officers there were a number of firearms in the cabin, some of

which were locked up, and that his son had pistols by his bed.

An officer arrested Adam on an outstanding warrant for failing to appear for

driving with a suspended license.  Officers took John to a motel for the night.  To

preserve the scene, officers stayed on site until the next morning, until roughly 6:30 a.m.

The Jennings's cabin, including the surrounding property, was searched on

September 3, 2013.  One of the two bedrooms in the cabin was identified as Adam's

because it contained his clothing and medication.  Adam's bedroom window had a clear

line of sight to where Mr. Carrigan's body had been found, 134 yards away.  Additionally,

officers found binoculars on a plastic barrel by Adam's open bedroom window and a box

of CCI Stinger .22 ammunition nearby.  The box of ammunition had both modified and

unmodified bullets.  A number of speed loaders were also found in Adam's bedroom,

loaded with .22 ammunition.  The base of the window had a number of marks or scrapes

on it.  The marks or scrapes were consistent with a rifle or shotgun having been fired

while resting on the base of the window.

Later that day, law enforcement interviewed John at the motel.  John stated that at

the time of the murder, he and Adam were inside the cabin after unloading firewood.

John said he was making tea when he heard the gunshots, and they immediately got on the

floor. He explained that it was safer on the ground because they had taken precautions to keep people off their property; they stacked firewood as a barricade and stretched out 1,300 feet of barbed wire along one side of the property. He explained that because of the barricades, a person from the Cow Camp Road side of their property would have to come around the barricades and, "'it would still leave [them] a lot of time to, you know, yell and scream at people.'" III-B Report of Proceedings (RP) (Nov. 18, 2015) at 699. When asked about the guns in the cabin, John told law enforcement that all the guns in the cabin were his and that they were all registered to him, or unregistered and bought from stores. When asked about his son's gun preferences, John explained that "'he carries pretty much what I carry. It's a .22 pistol.'" *Id.* at 712. John said a .22 rifle had been stolen years earlier, and he tried to report it to the police.[1] John also said that he was legally blind in one eye—so if he uses a long gun, he needs a scope. Seven of the firearms recovered from the cabin were registered to John but many firearms were unregistered.

On September 4, 2013, law enforcement interviewed Adam. Adam said that he had unloaded firewood with his father and was rolling a cigarette when he heard the gunshots. He said he then dropped to the ground and heard a vehicle drive away. He denied that he or his father shot Mr. Carrigan.

---

[1] An officer testified that he reviewed records and could not find any such report.

Law enforcement executed another search warrant on November 19, 2013.  Arrest warrants for John and Adam were executed the same day.

The searches revealed targets set up around the property.  The targets were placed at varying distances and heights.  All targets faced the cabin, so a person standing at the cabin would be facing the targets.  John had earlier told officers that the targets had not been used in a long time.  John's statement was inconsistent with the fresh, unweathered holes through many of the targets.  There were thousands of holes in the targets and trees surrounding them.  Many holes were indicative of shots from a .22 firearm.

During the autopsy, the medical examiner recovered a bullet near Mr. Carrigan's heart.  The bullet was consistent with a .22 rifle bullet, specifically a CCI Stinger bullet. The bullet was damaged, making identification of the gun that fired it more difficult.

Washington State Patrol firearm examiners tested many of the guns recovered from the cabin, but none were conclusively the firearm that fired the fatal shot.  The results of one firearm recovered from the cabin, a .22 caliber High Standard revolver, were inconclusive.  The revolver had some similarities—for example, the revolver could penetrate a body at 150 yards and the distance from the cabin to Mr. Carrigan's body was 134 yards.  A firearm examiner testified that the revolver could have fired the recovered bullet.

Bonnie Blasingame-Scott testified about a conversation she had with John on August 31, 2013, two days prior to the shooting. Ms. Blasingame-Scott worked at the local Chesaw Mercantile. Ms. Blasingame-Scott had only met Adam and John as customers at the store. They placed bulk orders about once per month at the mercantile. Two days before the shooting, John and Adam came into the store. Some locals were having a "light-hearted" conversation about the upcoming hunting season and how hunters were a pain. IV RP (Nov. 19, 2015) at 843. Ms. Blasingame-Scott commented that she puts ribbons around the neck of her livestock so hunters do not shoot them. John then said, "'If any hunters come on my property we'll shoot them.'" *Id.* John did not laugh. Adam nodded along to his father's statement. John then pulled back his coat to show a compact firearm under his long coat. The joking about hunters did not resume after John's statement.

After the five-day trial, the jury found John and Adam guilty of premeditated first degree murder, each with a firearm enhancement. The jury also found John guilty of unlawful delivery of a firearm to an ineligible person, and Adam guilty of unlawful possession of a firearm.

2.  CONFLICT-FREE COUNSEL

The Jennings's claim that they were denied conflict-free counsel is based on a purported conflict of interest between Melissa MacDougall, who represented Adam, and Michael Prince, who assisted in John's representation. We review what each attorney did, and who they represented throughout the lower court proceeding.

In December 2013, Ms. MacDougall and Mr. Prince were law partners. That month, Ms. MacDougall, Mr. Prince, and a third attorney with the firm signed a notice of appearance on behalf of Adam. Thereafter, Mr. Prince occasionally appeared in court on ministerial matters for Adam.

The trial court understood Mr. Prince's limited role. During a status conference hearing, the trial court told Adam that he was represented only by Ms. MacDougall, but that Mr. Prince occasionally covered her cases as her law partner. After explaining this, the trial court asked, "And so, you understand what Mr. Prince is doing today?" RP (Dec. 15, 2014—Status Conference Re: Adam) at 71. Adam replied, "Yes, Your Honor." *Id.* Additionally, Ms. MacDougall specifically told the trial court in 2014 that she was doing Adam's case by herself and that Mr. Prince was not working on Adam's case.

On June 22, 2015, Ms. MacDougall and Mr. Prince ended their legal partnership with a formal agreement. Ms. MacDougall continued as counsel for Adam.

In September 2015, three months after their law partnership ended, Mr. Prince began assisting John's attorney, Myles Johnson. That month, Mr. Prince filed a motion for trial continuance. Prior to hearing the motion, the trial court noted, "Ms. MacDougall represents Adam Jennings, she's here. Mr. Prince, you represent John Jennings." RP (Sept. 22, 2015—Motion Hearing) at 179. During the hearing, Mr. Prince explained to the court:

> Now, I guess I let the Court know . . . obviously I have been around . . . during the pendency of these cases. Even though my name originally appeared with Ms. MacDougall on her case, I never put in any work on that case, that—*I was working in District Court at that time*.[2] But I guess I let the Court know that I am aware of a lot of what's gone on in these cases and so I feel that I could be up to speed very quickly.

*Id.* at 189 (emphasis added).

During trial, Ms. MacDougall represented Adam, and Mr. Johnson and Mr. Prince were John's attorneys. The record shows that Mr. Johnson had the lead role at trial, while

---

[2] The record strongly implies that when Adam was arrested in September 2013, Mr. Prince represented Adam on the district court driving while license suspended matter. As reflected by the italicized comment, Mr. Prince was not working in district court in September 2015. We infer from this that Mr. Prince was no longer representing Adam in the district court matter when Mr. Prince began representing John in September 2015.

Mr. Prince had a subordinate role. Mr. Prince's trial participation was limited to preparing jury instructions and questioning ballistics witnesses.

## ANALYSIS

On appeal, John and Adam raise five issues. We address them in the order raised in their briefs.

1. SUFFICIENCY OF THE EVIDENCE

John challenges the sufficiency of the evidence for his conviction of delivery of a firearm to an ineligible person. John and Adam both challenge the sufficiency of the evidence for their convictions for premeditated first degree murder.

A defendant's challenge to the sufficiency of the evidence requires the reviewing court to view the evidence in the light most favorable to the State and determine "whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt." *State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "[A]ll reasonable inferences from the evidence [are] interpreted most strongly against the defendant." *Id*. "In determining the sufficiency of the evidence, circumstantial evidence

is not to be considered any less reliable than direct evidence." *State v. Delmarter*, 94

Wn.2d 634, 638, 618 P.2d 99 (1980).

Neither John nor Adam objected to the giving of any jury instruction or excepted

to the failure to give any instruction. Therefore, the court's instructions to the jury

constitute the law of the case, and we review the sufficiency of the evidence based on the

elements contained in the to-convict instructions. *State v. Hickman*, 135 Wn.2d 97, 101-

02, 954 P.2d 900 (1998).

*Delivery of a firearm to an ineligible person—John*

RCW 9.41.080 provides in relevant part:

No person may *deliver* a firearm to any person whom he or she has
reasonable cause to believe is ineligible under RCW 9.41.040 to possess a
firearm. Any person violating this section is guilty of a class C felony . . . .

(Emphasis added).

The trial court's to-convict instruction on this count provided, in relevant part:

To convict the defendant, John Jennings, of the crime of unlawful
delivery of a firearm, each of the following elements of the crime must be
proved beyond a reasonable doubt:
(1) *That on or about September 2, 2013, the defendant delivered a
firearm to Adam Jennings*;
(2) That the defendant had reasonable cause to believe that Adam
Jennings was ineligible to possess a firearm because he was previously
convicted in this state or elsewhere of a serious offense; and
(3) That the delivery occurred in the State of Washington.

11

CP (No. 33910-6-III, Adam) at 51 (emphasis added).

John primarily challenges element 1, that he "delivered" a firearm to his son. Neither chapter 9.41 RCW nor decisional law defines "delivered" in this context. Our objective when interpreting a statute is to determine the legislature's intent. *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010). The surest indication of such intent is the language used by the legislature; so if the language is plain on its face, we give effect to that plain meaning. *Id.* In determining the plain meaning of a provision, we look to the statutory text, related statutory provisions, and the statutory scheme as a whole. *Id.*

With respect to the statutory text, the parties have offered differing definitions of "deliver." We note that some definitions require an actual handing over of an item, while others are less stringent and require as little as permissive use. Because the term "deliver" is susceptible to more than one meaning, the statutory text does not assist us in our plain meaning analysis. With respect to related provisions or statutory scheme, there is nothing that assists our analysis.

When there is no plain meaning of a provision, the statute is ambiguous; in that event, we may resort to legislative history, relevant case law, and rules of statutory construction in discerning legislative intent. *Id.* at 820.

12

With respect to legislative history, neither the parties nor we have found any that assist in our analysis. With respect to relevant case law, the State cites cases construing former RCW 69.50.101(f) (2013), which defines "deliver" in the context of the unlawful delivery of controlled substances. There, the statute itself defines "delivery" as including the "constructive transfer from one person to another." *Id.* We reject the State's invitation to apply cases that construe former RCW 69.50.101(f). Those cases construe a statute that explicitly includes both actual and constructive delivery; here, the statute does not explicitly include constructive delivery.

Having exhausted these primary tools of statutory construction, we are left with applying the rule of lenity. The rule ensures fair warning by resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. *United States v. Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997); *State v. Bradshaw*, 3 Wn. App. 2d 187, 195, 414 P.3d 1148 (2018). When we must choose between two readings of what conduct the legislature has made a crime, we should require, before we chose the harsher alternative, that the legislature speak in clear and definite language. *State v. Weatherwax*, 188 Wn.2d 139, 155, 392 P.3d 1054 (2017).

Applying the rule of lenity, this author construes "deliver" narrowly to require the actual physical delivery of a firearm. This narrow definition does not criminalize the

mere permitting of another to use one's firearm.  Had the legislature intended to criminalize such passive conduct, it could have by saying so.  It did not.

We note that circumstantial evidence is entitled to as much weight as direct evidence.  *Delmarter*, 94 Wn.2d at 638.  Here, John purchased numerous guns and kept them unlocked in his cabin.  Also, Adam had a key to John's gun safe, and John admitted that Adam used his guns.  From this evidence, a reasonable trier of fact might find beyond a reasonable doubt that John actually delivered at least one firearm to Adam *at some time*.

But there was no evidence, direct or circumstantial, that John actually delivered a firearm to Adam *on or about September 2, 2013*.  The State was required to prove beyond a reasonable doubt this temporal component of the to-convict instruction.  *State v. Jensen*, 125 Wn. App. 319, 325-26, 104 P.3d 717 (2005).[3]  For this reason, a majority of the panel concludes that the State failed to present sufficient evidence on this element, and we reverse John's conviction on this particular count.

---

[3] The dissent cites *State v. Hayes*, 81 Wn. App. 425, 432-33, 914 P.2d 788 (1996) for the proposition that the State need not prove the temporal component of the jury instruction unless the defendant raised an alibi defense at trial.  *Hayes* does not stand for that proposition.  In *Hayes*, the defendant did not argue the *Hickman* issue on appeal, i.e., that the State failed to prove the temporal component of the *jury instruction*.  Instead, the defendant argued that the State failed to prove the temporal component in the "*charging period.*"  *Id.* at 432.  That is not the issue here.

*Premeditated First Degree Murder—John and Adam*

John and Adam tacitly concede the State produced sufficient evidence that someone from inside the cabin shot Mr. Carrigan on September 2, 2013. They contend that there was insufficient evidence that either acted as a principal and there was insufficient evidence that the other assisted or was ready to assist the principal. Their arguments require us to review the law of criminal accomplice liability.

A person is an accomplice to a crime if "[w]ith knowledge that it will promote or facilitate the commission of the crime, he or she . . . encourages . . . another person to commit [the crime] or . . . [a]ids or agrees to aid such other person in planning or committing [the crime]." RCW 9A.08.020(3). "[A] jury is not required to determine which participant acted as a principal and which participant acted as an accomplice." *In re Pers. Restraint of Hegney*, 138 Wn. App. 511, 524, 158 P.3d 1193 (2007). Instead, "[t]he jury need only conclude unanimously that both the principal and accomplice participated in the crime." *Id*. It does not matter if some jurors believed that the defendant fired the fatal shot, while others believed that the defendant was simply an accomplice. *State v. Hoffman*, 116 Wn.2d 51, 104, 804 P.2d 577 (1991). This is because "[a]ccomplice liability represents a legislative decision that one who participates in a crime is guilty as a principal, regardless of the degree of the participation." *Id*.

15

More particular to the situation here:

> In this state when it cannot be determined which of two defendants actually committed a crime, and which one encouraged or counseled, it is not necessary to establish the role of each. It is sufficient if there is a showing that each defendant was involved in the commission of the crime, having committed at least one overt act . . . .

*State v. Baylor*, 17 Wn. App. 616, 618, 565 P.2d 99 (1977).

Here, the evidence was sufficient for a reasonable trier of fact to find beyond a reasonable doubt that John or Adam was the shooter and that the other was involved in the crime's commission. First, the evidence sufficiently establishes beyond a reasonable doubt that either John or Adam was the shooter. Mr. Carrigan was shot by a .22 Stinger round similar to the .22 Stingers found in Adam's bedroom, Adam's bedroom window had a clear view to where Mr. Carrigan was shot, and Mr. Carrigan was killed within range of at least one of the .22 guns found in Adam's bedroom.

Second, sufficient evidence permitted a reasonable jury to find that both men were involved in the commission of the crime. The men had barricaded the cabin with firewood, placed targets on the property to practice shooting from the cabin itself, and had a stockpile of guns and ammunition inside the cabin. Two days before the shooting, John told Ms. Blasingame-Scott at the mercantile, "'If any hunters come on my property *we'll* shoot them.'" IV RP (Nov. 19, 2015) at 843 (emphasis added). In agreement, Adam

nodded as his father revealed his compact firearm to the locals. Two days later, a hunter appeared on or near John's property and either John or Adam shot and killed the hunter. Because they had both prepared for the event described by John, affirmed by Adam, and two days later performed by one of them, we conclude that the State presented sufficient evidence for a reasonable trier of fact to find that both were involved in committing the crime, whether as a principal or as an accomplice.

2.      RIGHT TO CONFLICT-FREE COUNSEL

John and Adam argue that their attorneys, Ms. MacDougall and Mr. Prince, had conflicts of interest that violated their Sixth Amendment to the United States Constitution right to conflict-free counsel.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." This right includes the right to the assistance of a conflict-free attorney. *State v. Dhaliwal*, 150 Wn.2d 559, 566, 79 P.3d 432 (2003).

In *Holloway v. Arkansas*, 435 U.S. 475, 477, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978), one defense attorney represented three codefendants. The defense attorney timely informed the trial court of conflicts of interest requiring separate counsel, but the trial court refused to consider appointing separate counsel. *Id.* The United States Supreme

Court held that state trial courts are required to investigate timely objections to multiple representation. *Id.* at 490-91. In a subsequent case, *Cuyler v. Sullivan*, 446 U.S. 335, 346-47, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), the Supreme Court clarified that "[a]bsent special circumstances, . . . trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." Thus, reversal is not required if a trial court knows of a potential conflict but fails to inquire when no objection is raised. *Dhaliwal*, 150 Wn.2d at 571. The Supreme Court in *Sullivan* explained, "'An attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial.'" *Sullivan*, 446 U.S. at 347 (internal quotation marks omitted) (quoting *Holloway*, 435 U.S. at 485).

> *Neither defendant advised the trial court of the purported conflict*
> *of interest*

We first must determine if anyone advised the trial court of a purported conflict of interest between Ms. MacDougall and Mr. Prince. We note that no attorney brought such an issue before the trial court. Both John and Adam cite a May 2015 letter written by John to the trial court. For the benefit of the reader, we have edited the letter to correct more than a dozen spelling errors:

18

I am writing to request an attorney ad litem be appointed to research this case and offer a friend of the court brief.

I believe this is needed to ensure a fair trial if need be. I further believe that a conflict of interest exists between the needs of myself and my son and our court appointed attorneys. It would seem to me our attorneys have their own agenda and are not wanting to zealously defend us. Furthermore I believe Ms. MacDougall has only her political agenda in mind and Mr. Blount can't think of anything but his future personal financial affluence.

CP (No. 33932-7-III, John) at 220.

This letter did not advise the trial court of a purported conflict of interest between Ms. MacDougall and Mr. Prince. The letter instead advised the trial court of a purported conflict of interest between Ms. MacDougall and John's former attorney, Nicholas Blount.

> *No showing that counsel had a conflict that adversely impacted performance*

When a defendant fails to advise the trial court of a purported conflict of interest, a defendant is not entitled to relief unless the defendant can show that counsel had a conflict that adversely affected counsel's performance. *Dhaliwal*, 150 Wn.2d at 569.

Here, Mr. Prince did not participate in John's defense until September 2015. By that time, he and Ms. MacDougall no longer were law partners, and his district court representation of Adam had concluded. Mr. Prince's participation in John's felony

19

defense was very limited. From September 2015 through trial, Mr. Prince represented John. But Mr. Prince's role was secondary to John's primary counsel, Mr. Johnson.

The Jennings argue that Mr. Prince likely had a role in the decision to pursue a unified defense rather than having one defendant point to the other as the principal. Their argument belies the fact that Mr. Prince's involvement in Adam's defense was very minimal and his later involvement with John's defense was secondary, assisting John's primary counsel. There is no evidence, apart from pure speculation, that Mr. Prince played a role in deciding defense strategy. Rather, primary counsel for each defendant, Ms. MacDougall and Mr. Johnson, likely decided defense strategy.

In his reply brief, John argues for the first time that Mr. Prince was precluded by RPC 1.9 from representing him. RPC 1.9 sets forth an attorney's duties to a former client. First, we will not consider an argument raised for the first time in a reply brief. *FPA Crescent Assocs., LLC v. Jamie's, LLC*, 190 Wn. App. 666, 679, 360 P.3d 934 (2015). Second, John has no standing to assert a purported violation of the RPC, which concerns duties to Adam, a former client. *Foley-Ciccantelli v. Bishop's Grove Condo. Ass'n*, 2011 WI 36, 333 Wis. 2d 402, 438, 797 N.W.2d 789.

3.    PROSECUTORIAL MISCONDUCT CLAIM

Adam and John argue that the prosecutor made various statements during closing arguments that constitute sufficient misconduct to warrant a new trial.

To succeed on their prosecutorial misconduct claims, Adam and John have the burden to establish the prosecutor's conduct was improper *and* prejudicial. *In re Pers. Restraint of Sandoval*, 189 Wn.2d 811, 821, 408 P.3d 675 (2018). "To be prejudicial, a substantial likelihood must exist that the misconduct affected the jury's verdict." *State v. Davis*, 175 Wn.2d 287, 331, 290 P.3d 43 (2012).

Additionally, in closing argument, a prosecutor "has wide latitude to argue reasonable inferences from the evidence." *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). However, a prosecutor may not "comment on the lack of defense evidence because the defendant has no duty to present evidence [and] the State bears the whole burden of proving each element of the case beyond a reasonable doubt." *State v. Cleveland*, 58 Wn. App. 634, 647, 794 P.2d 546 (1990).

*First claim of misconduct: referring to John and Adam jointly*

John complains that the prosecutor, during closing, often referred to Adam and him collectively, rather than individually, thus confusing the jury on whether sufficient evidence was presented to convict either.

21

The State charged both John and Adam as principal or accomplice for the murder of Mr. Carrigan. The State's references to "they" or "them" was consistent with the State's theory and argument that both participated and were involved in the murder. The prosecutor had wide latitude to make that argument. The argument is also consistent with the Washington rule that the jury does not have to decide which of two codefendants pulled the trigger; only that both were involved in the crime. *Hegney*, 138 Wn. App. at 524.

As discussed above, there was substantial evidence that both John and Adam participated in killing Mr. Carrigan, and this evidence permitted a finding of accomplice liability. We conclude that the prosecutor's arguments were based on the evidence and not improper. Similarly, the prosecutor was not required to argue which defendant, John or Adam, fired the lethal shot.

*Second claim of misconduct: speculation about missing gun*

John and Adam argue that the prosecutor committed misconduct by arguing that they hid the murder weapon before law enforcement arrived. They assert that the prosecutor's argument was not based on the evidence and violated the trial court's order in limine. We disagree.

22

There were approximately 90 minutes between when Mr. Carrigan was shot and when law enforcement arrived at the Jennings's cabin. During the search of the Jennings's cabin, law enforcement found sawed-off gun barrels, but did not find the sawed-off shotgun bases. The prosecutor explained during motions in limine that he hoped the jury would draw the inference that Adam and John may have hidden guns in that 90 minutes. The trial court excluded "officer opinion or prosecutorial comments, key word there, opinion, about the defendants hiding guns. . . . Facts yes, opinions no." RP (Nov. 13, 2015—Defense Motions in Limine) at 400.

At trial, the jury heard that law enforcement found sawed-off shotgun barrels but not the bases. During closing, the prosecutor discussed this and then remarked:

> The argument that, "Well, why do these other guns matter?" Well, they matter for other counts directly. But they matter for this count, the murder count, because in fact they show the defendants not only had multiple weapons, and all the ammunition and everything else that went along with that, but *they also—manipulated and—got rid of some weapons—very clearly.* That's why it matters.

VI RP (Nov. 23, 2015) at 1121 (emphasis added).

The comment "got rid of some weapons" was a permissible inference based on the evidence presented at trial. This statement is permissible in the wide latitude given to prosecutors to argue inferences from the evidence in closing arguments.

If the prosecutor's argument violated the order in limine, it was incumbent on the Jennings to object. They did not. Their failure to object precludes our review of the purported violation of the order in limine. *State v. Sullivan*, 69 Wn. App. 167, 171-73, 847 P.2d 953 (1993).

> *Third claim of misconduct: remark implying that the defendants had an obligation to testify and present evidence*

John and Adam argue that the prosecutor made an improper remark that shifted the burden of proof to them and impacted their constitutional right to remain silent. The prosecutor remarked:

> The defendants—*had the opportunity to have witnesses presented*, have you all consider the evidence, to weigh—you have reasonable doubt whether they committed the murder. *None of which were offered* (inaudible).

VI RP (Nov. 23, 2015) at 1131 (emphasis added).

This remark was improper. In *State v. Dixon*, 150 Wn. App. 46, 55, 207 P.3d 459 (2009), we held that a prosecutor may not comment about a defendant's failure to call a witness if the comment would infringe on the defendant's right to remain silent. Here, the only uncalled witnesses to the shooting were the defendants. For this reason, the remark was improper.

24

The remark was improper for an additional reason. The remark implied that the defendants had an obligation to present evidence when no such obligation exists. *Cleveland*, 58 Wn. App. at 647.

The Jennings did not object to the prosecutor's improper remark. The "'failure to object to an improper remark constitutes a waiver of error unless the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.'" *Thorgerson*, 172 Wn.2d at 443 (quoting *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994)). Thus, when a defendant did not object below, relief can be granted only if the error was so egregious that it was beyond cure by the trial judge. *State v. Swan*, 114 Wn.2d 613, 661, 790 P.2d 610 (1990); *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988).

Here, the prosecutor did not repeat his improper remark. We find this important in determining that the remark was not flagrant or ill-intentioned. Also, had John or Adam objected, the trial court would have sustained the objection and could have instructed the jury that the State had the burden of proving its case beyond a reasonable doubt, and because of this, the Jennings had no obligation to present any witnesses or evidence. We conclude that the prosecutor's remark, although improper, was not sufficiently egregious that it could not have been cured by a proper instruction.

25

4.      CUMULATIVE ERROR CLAIM

Adam and John argue that cumulative errors require reversal of both murder

convictions. "The cumulative error doctrine applies when several trial errors occurred

and none alone warrants reversal but the combined errors effectively denied the defendant

a fair trial." *State v. Jackson*, 150 Wn. App. 877, 889, 209 P.3d 553 (2009). "The

defendant bears the burden of proving an accumulation of error of sufficient magnitude

that retrial is necessary." *State v. Yarbrough*, 151 Wn. App. 66, 98, 210 P.3d 1029 (2009)

(citing *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835, 870 P.2d 964

(1994)). We have concluded that the only error relative to the murder convictions was the

prosecutor's one improper remark during closing and that error was waived by a lack of

objection. For this reason, there is no cumulative error.

5.      APPELLATE COSTS

Adam asks the panel to exercise its discretion to waive costs on appeal. In

accordance with RAP 14.2, we defer the decision of appellate costs to our court

commissioner or clerk/administrator.

No. 33910-6-III; No. 33932-7-III
*State v. Adam Jennings*; *State v. John Jennings*

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW

In a statement of additional grounds for review, Adam raises a general claim of innocence. Because the claim contains no legal argument, his statement is insufficient for review. RAP 10.10(c).

CONCLUSION

We reverse John's conviction for delivery of a firearm to an ineligible person and remand for resentencing. We otherwise affirm the convictions.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, C.J.

I CONCUR:

Fearing, J.

27

No. 33910-6-III (consolidated w/ 33932-7-III)

SIDDOWAY, J. (dissenting in part) — Jurors found John Jennings guilty of a violation of RCW 9.41.080, which provides that "[n]o person may deliver a firearm to any person whom he or she has reasonable cause to believe is ineligible under RCW 9.41.040 to possess a firearm." They were persuaded that John delivered a firearm to Adam, whom they were informed, by stipulation, was ineligible to possess one. The State's evidence was sufficient. I would affirm.

The State's evidence went beyond demonstrating that Adam used a firearm belonging to his father. The State presented evidence from which jurors could conclude beyond a reasonable doubt that Adam had his father's standing permission to use his father's firearms whenever he wanted, and that he regularly did use them. Some of the firearms were locked up. The State proved that a key to the safe was found in Adams's room both times the cabin was searched. This, and the evidence that Adam played a role in the murder of Michael Carrigan, is substantial evidence of a violation of RCW 9.41.080 on or about the September 2, 2013 date of the murder.

The majority's author errs by applying the rule of lenity. "The rule of lenity is the last, not the first, resort when a criminal statute must be construed." *City of Seattle v. Winebrenner*, 167 Wn.2d 451, 469, 219 P.3d 686 (2009) (Madsen, J., concurring). "To determine whether to apply the rule, the court must first make a 'serious investigation' of the language of the statute and its purpose, its context, related statutes, the statutory scheme, and legislative history. It is improper to create or assume ambiguity and then

turn to the rule of lenity to resolve it." *Id.* (quoting Lawrence M. Solan, *Law, Language, and Lenity*, 40 WM. & MARY L. REV. 57, 115 (1998)).

In *Burton v. Lehman*, our Supreme Court construed the word "delivery" as used in a different statute. It relied on "delivery's" dictionary definition as meaning "'[t]he formal act of transferring something . . . ; the giving or yielding possession or control of something to another.'" 153 Wn.2d 416, 424, 103 P.3d 1230 (2005) (quoting BLACK'S LAW DICTIONARY 461 (8th ed. 2004)). The court recognized that "the law recognizes that delivery may be actual, constructive, or symbolic," *id.*, even though not every meaning of "delivery" may be reasonable in a particular context.

In many contexts, multiple meanings of "deliver" or "delivery" are recognized as reasonable. One example is the word's use in a criminal context, the Uniform Controlled Substances Act, chapter 69.50 RCW, which criminalizes the actual or constructive transfer ("delivery") of controlled substances. *See* RCW 69.50.101(g). Another is the common law of gifts, which recognizes "delivery" as an essential element of a completed gift, but does not require proof of hand delivery. *E.g.*, *In re Marriage of Zier*, 136 Wn. App. 40, 47, 147 P.3d 624 (2006) (what constitutes "delivery" depends on the nature of the property and the attendant circumstances). A third is the common law of insurance, which requires delivery of a policy but not hand delivery. *E.g.*, *Frye v. Prudential Ins. Co. of Am.*, 157 Wash. 88, 90-91, 288 P. 262 (1930) ("Delivery" of an insurance policy may be actual or constructive, with certain mailings of a policy qualifying as delivery.).

2

Before resorting to the rule of lenity, then, the issue is whether it is reasonable to construe RCW 9.41.080 as using "deliver" in its multiple accepted senses, and therefore unreasonable to arbitrarily rule out one accepted meaning of the word.

In *Bernethy v. Walt Failor's, Inc.*, our Supreme Court described former RCW 9.41.080 (1982) as, "at a minimum, reflect[ing] a strong public policy in our state that certain people should not be *provided with* dangerous weapons." 97 Wn.2d 929, 933, 653 P.2d 280 (1982) (emphasis added). One can "provide [a person] with" dangerous weapons by making firearms accessible and granting standing permission to use them. In fact, John's standing permission was a particularly effective way of providing Adam with dangerous weapons, since John did not have to be present and available to place a firearm in Adam's hands. Given the purpose of RCW 9.41.080, the dictionary definition of "delivery" as "yielding possession or control . . . to another" is every bit as reasonable a construction as is "giving possession or control" in the sense of physically handing a firearm to another.

No case law is cited nor is any principled reason offered for Adams's argument that physically handing something to another is the "narrow" construction of "deliver" and therefore appropriate. Pointing out that RCW 9.41.080 does not define "deliver" as including "constructive" delivery is not persuasive, since the word is not defined as limited to "actual" delivery, either. Both are accepted meanings of the unmodified word "deliver."

3

Adams's construction of "deliver" as having only one of its accepted meanings, but not another, is arbitrary and unreasonable. Because the meaning he proposes is merely a possible meaning but not a reasonable one given the purpose of the statute, RCW 9.41.080 is not ambiguous. The rule of lenity need not be applied. *State v. McGee*, 122 Wn.2d 783, 787, 864 P.2d 912 (1993).

The majority's decision to reverse John's conviction does not depend on Adam's construction of "deliver," however. It depends instead on the asserted absence of evidence that John delivered a firearm to Adam "on or about September 2, 2013." Clerk's Papers (No. 33932-7-III, John) at 140-41. In my view, because John's delivery of a weapon was ongoing, recurring whenever Adam acted on his father's standing permission, there was sufficient evidence that Adam acted on that permission on or about September 2, 2013. Alternatively, it is well settled that where time is not a material element of the charged crime, the language "on or about" is sufficient to admit proof of the act at any time within the statute of limitations, so long as there is no defense of alibi. *State v. Hayes*, 81 Wn. App, 425, 432, 914 P.2d 788 (1996). In *Hayes*, the "on or about" limitation appeared not only in the charging document, but also in the instructions to the jury. *See id.* at 431 n.9.

For these reasons, I would affirm John's conviction of delivery of a firearm to an ineligible person.

_Siddoway, Jr._

Siddoway, J.

4